UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SIMONE VILAIRE,

                                                COMPLAINT

             Plaintiff,

  -against-                            Case No.:  1:26-cv-02723

AMAZON.COM SERVICES LLC, AMAZON.COM,
INC., AMAZON.COM SALES, INC., AMAZON
LOGISTICS, INC. and HE YUAN SHI WEI DE
DIANZI KE JI YOU XIAN GONG SI d/b/a WEIDE
HEAT,

             Defendants.

Plaintiff, Simone Vilaire, by and through her attorneys, Beatty Law, PLLC, hereby submits as and for a Complaint against Defendants:

**NATURE OF ACTION**

1.      This is a strict products liability and negligence action under the New York State common law arising out of serious and permanent injuries suffered by Simone Villaire while using a LPCRILLY Rechargeable Heated Glove (hereinafter "the heated gloves") manufactured by He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si d/b/a Weide Heat (hereinafter "WEIDE HEAT"), sold by Weide Heat, and warehoused, stored, distributed and retailed by, upon information and belief, AMAZON.COM SERVICES LLC, and/or AMAZON.COM, INC., AMAZON.COM SALES, INC., and/or AMAZON LOGISTICS, INC. For years prior to Ms. Vilaire's injury, the heated gloves had been previously complained about on Amazon's website-complaints by purchasers of unregulated heating and of persons getting burned with normal

1

foreseeable use of the product, all of which were ignored by Amazon as that Defendant continued to store, sell and profit off of the product.

2.      Since the beginning, Amazon's business model depends on more products for greater selection, to drive traffic to the site, for greater revenue.  By developing and propping up unproven brands for its own profit, Amazon enables unaccountable companies to exist. It promotes them to the forefront of its online store, replacing safe and established brands with dangerous products consumers do not need. At the same time, Amazon systematically advertises the safety of its products and its internal regulatory policies, giving consumers and the Plaintiff a false sense of security.

3.      In this case, He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si d/b/a Weide Heat, boasted on Amazon's marketplace that its heated gloves were "safe and "comfortable" and that "[t]he hand is not directly contact with the wire, ensure [sic]your hands will not hurt by the heat."



4.      This product was manufactured carelessly, negligently and recklessly by the Chinese company He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si d/b/a Weide Heat and Amazon was a warehouser, seller, distributor, retailer, shipper and commercial intermediary within the chain of distribution of the subject product.

2

5.     Amazon exercised significant control over the storage, inventory control, distribution, logistics oversight, sale, marketing, listing, packaging, fulfillment, and delivery of the product; processed the payment; dictated the terms of the transaction; and placed the product into the stream of commerce.

6.     Amazon stored, handled, packaged, and shipped the product through its fulfillment system, had the ability to prevent the product from reaching consumers, and derived direct financial benefit from the sale.  Consumers, including the Plaintiff and her father, reasonably relied on Amazon's platform, representations, and reputation in purchasing the product. Whether Amazon technically took title of the product is not dispositive under New York law, which imposes liability on all entities that participate in placing a defective product into the stream of commerce.

## THE PARTIES

7.     Plaintiff Simone Vilaire is a citizen of the United States and a resident of Brooklyn, King's County, New York State.

8.     Defendant He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si is a Chinese entity with the principal place of business in 1st Floor, No. 27, Shangcheng County, Front Street, Yuan Cheng District, Heyuan City, Guang Dong, China.

9.     Defendant He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si is doing business as Weide Heat, a manufacturer of rechargeable battery heated clothing, including heated gloves, and is hereinafter referred to as "Weide Heat" under the name LPCRILLY.

10.     Defendant Amazon.Com Services LLC. is a corporation organized and existing under the laws of the state of Delaware with a principal place of business located at 410 Terry Ave. N Seattle, Washington.

11.     Amazon.Com Sales, Inc. is a corporation organized and existing under the laws of the state of Delaware with a principal place of business located at 410 Terry Ave. N Seattle, Washington.

12.     Amazon.com, Inc., is a corporation organized and existing under the laws of the state of Delaware with a principal place of business located at 410 Terry Ave. N Seattle, Washington.

13.     Amazon Logistics, Inc. is a corporation organized and existing under the laws of the state of Delaware with a principal place of business located at 410 Terry Ave. N Seattle, Washington.

14.     All Defendants are hereinafter collectively referred to as "Defendants."

15.     All Amazon Defendants are hereinafter collectively referred to as "Amazon."

## JURISDICTION AND VENUE

16.     This court has subject matter jurisdiction pursuant to 28 USC §1332 because plaintiff and Defendants are citizens of different states or countries and there is complete diversity between them, and the amount in controversy exceeds seventy-five thousand dollars ($75,000), excluding interest and costs.

17.     This court has personal jurisdiction over Amazon pursuant to NY CPLR section 302 because

a.     Amazon transacts business within and contracts to supply goods or services in the State of New York through its highly interactive website accessible to consumers for the purpose of selling goods; provides advertisements throughout the State of New York; maintains a distribution, delivery and fulfillment network throughout the State of New York:

b.     The tortious act was committed within the State of New York.

c.     The tortious act was committed outside the State of New York causing injury to a person within the State of New York; and

4

i.    Amazon regularly does and solicits business and derives substantial revenue from goods used or consumed in the State of New York, or

ii.    Amazon owns, uses, or possesses real property situated within the State of New York, including warehouses, fulfillment centers and offices throughout the State of New York.

18.    This court has personal jurisdiction over Weide Heat pursuant to NY CPLR § 302 because:

a.    Weide Heat regularly offers and sells their goods through Amazon.com, which permits Weide Heat to transact business within and place their products into the stream of commerce with the State of New York.

b.    The tortious act was committed within the State of New York; and/or

c.    The tortious act was committed outside the State of New York causing injury to a person within the State of New York and:

i.    by using Amazon to sell their products Weide Heat regularly does and solicits business and derives substantial revenue from goods used or consumed in the State of New York,

ii.    by using Amazon to sell their products, Weide Heat expected or should reasonably have expected their acts to have consequences in the State of New York, and they derive substantial revenue from interstate or international commerce.

19.    Venue is proper pursuant to 28 USC § 1391(b) (2) as a substantial part of the events or omissions giving rise to the claim occurred within the Eastern District of New York.

## FACTS

## AMAZON INC.

### Overview of Amazon

20. Amazon was founded by Jeff Bezos on July 5, 1994, in Bellevue, King County, Washington as an online bookstore, initially relying on third-party distributors and wholesalers for order fulfillment.

5

21.     In 2000 Amazon launched its third-party marketplace, allowing small business owners to put their products on Amazon – for a fee.

22.     In 2006 Amazon launched its "fulfilled by Amazon" program – where it took over the customer service, packaging, and distribution for third-party sellers on its platform – for a fee.

23.     Since its inception Amazon has operated under the "Amazon Virtuous Cycle" (i.e. Flywheel).



[1]

24.     The Amazon Virtuous Cycle model thrives on increased traffic to Amazon.com; which garners more sellers to the Amazon marketplace; which in turn increases selection, lowers costs/prices, and leads to a better overall customer experience; that will lead to more traffic – for the cycle to start again.

---

[1] https://www.amazon.jobs/en/landing_pages/about-amazon

25.     In other words, more selection, through third-party sellers, equals more profits for Amazon.

26.     Today, Amazon is the world's most valuable retail company by market capitalization. Amazon's revenues in 2025 were $716.9 billion and as of May 4, 2026, its market capitalization is $2.92 trillion.

27.     Despite being the largest retailer in the world, Amazon regularly claims it is not a product seller, or retailer, or distributor under state product liability laws.  Amazon argues instead it is purely a marketplace, analogous to a shopping mall that merely houses retailers.

**Amazon's Business Model**

28.     Amazon has developed its status as the most valuable retailer by expanding the selection of its products at its stores and by creating services for affiliated retailers that control almost all aspects of how goods are bought and sold over the internet.

29.     Amazon's primary business model is to sell products for other sellers and take a commission on those sales. The more services it offers to those sellers, the larger its commission. Amazon calls these sellers, "selling partners," "third-party sellers," or "sellers of record."

30.     Sixty percent of the units sold on Amazon are from what Amazon terms "selling partners."  These parties in certain situations can pay over 50-60% of the proceeds of a sale to Amazon.[2]

(Intentionally left blank)

---

[2] https://www.thestreet.com/investing/heres-how-much-amazon-takes-from-every-third-party-sale

**Amazon creates companies that otherwise would not exist**

31.     Amazon has created a world where anyone can sell a product with national distribution directly from their laptop.[3]

32.     Amazon advises its Selling Partners that "you don't have to solve every business problem. Use Amazon's infrastructure, tools, and customer reach to grow your business."[4]

33.     These amateur sellers are instructed on how to sell by Amazon training programs and apps created, hosted, serviced by Amazon

34.     Amazon created its Seller University, which it describes as "free educational resources to help brands, businesses, and entrepreneurs learn how to succeed as Amazon selling partners."[5]

35.     Amazon has a Selling Partner Appstore that provides is used by more than 1 million sellers worldwide to help sellers build, manage, "automate", and scale their business whereby Amazon turbo charges the reach of Selling Partners."[6]

36.     Amazon promises these Selling Partners, "unrivaled scale, no cap." It offers Selling Partners the ability "build, grow and scale your brand with our innovative toolkit."[7]

---

[3] "Selling in Amazon stores enables you to build a worldwide company from your laptop. Advertising, promotions, and global selling are just a few ways to expand." https://sell.amazon.com/sell

[4] https://sell.amazon.com/learn/start-ecommerce-business

[5] https://sell.amazon.com/learn/seller-university#:~:text=Register%20for%20weekly%20live%20training,For%20experienced%20sellers

[6] https://sell.amazon.com/tools/selling-partner-appstore

[7] https://sell.amazon.com/start?ld=SEUSSOAGOOG-NAG129-TOPIS-D_go_cmp-20623611787_adg-159520991750_ad-691793319352_kwd-1889795844_dev-c_ext-_prd-_sig-CjwKCAjwzevPBhBaEiwAplAxvjBywkQsdEs1lX3Yyj0waovae3rCoYi0gkHeg7sP0JKZxg0xEiyEmBoC2o0QAvD_BwE_sigb-0AAAAACcYLw7X_XlWXwUEa0nb1_D-8Sn0I_siwb-CkAKCAjwqubPBhBjEjAAQ8_pKZNtWZxZLUhX1QJ9c-CUwtKKA_OFfr5UBtJPmlnadvJh1Cc47CsUV12aDpQaAoP2&gad_campaignid=20623611787&gbraid=0AAAAACcYLw7X_XlWXwUEa0nb1_D-

37.     Amazon manages all products sold on its website through Amazon's Sellers Central. From this parallel site Amazon instructs Selling Partners how to maximize profits. It instructs selling partners on what to sell, how to find manufacturers to keep costs low, and how to create separately branded products that give the appearance of safety.

38.     Through Amazon's product opportunity explorer Amazon feeds selling partners "ideas for new products or offers," by "provid[ing] insight into Amazon customer search and purchase behavior."[8]

39.     On the Amazon Seller Central article *7 Ways to Make Money on Amazon*, selling partners are instructed to "work with a wholesaler or a manufacturer to setup a supply chain and get products into the hands of as many customers as possible."[9]

40.     In the Q&A portion of *Making money with Amazon,* Amazon states, "you can sell almost anything in Amazon stores."[10]

41.     Amazon advises that, "selling restricted products on Amazon can be one of the pillars of your marketing strategy. This is because the competition in the restricted categories is way lower. **Hence, higher potential profit margins**."[11]

42.     In the *How to find wholesalers and suppliers for your business* Amazon provides a list of instructions on how to locate, and work with manufacturers and wholesalers.[12]

---

8Sn0I&gclid=CjwKCAjwzevPBhBaEiwAplAxvjBywkQsdEs1lX3Yyj0waovae3rCoYi0gkHeg7sP0JKZxg0xEiyEmBoC2o0QAvD_BwE

[8] https://sell.amazon.com/blog/product-opportunity-explorer
[9] https://sell.amazon.com/blog/make-money-on-amazon
[10] https://sell.amazon.com/blog/make-money-on-amazon
[11] https://www.sellerassistant.app/blog/amazon-restricted-products-complete-guide-for-sellers
[12] https://sell.amazon.com/blog/how-to-find-wholesalers

43.     Amazon advises its selling partners that, "[w]holesale sourcing is where a business purchases products in bulk at a discount from a wholesale supplier. The seller  can then **repackage the products and sell them to customers for a profit**."[13]

44.     Amazon instructs amateur sellers on how to create a brand sold on and off-Amazon and then how to manage it through Sellers Central.

45.     Amazon pitches the service Brand Registry to its Selling Partners, which Amazon states, "can help you personalize your brand and product pages, protect your trademarks and intellectual property, and improve the brand experience for customers-along with unlocking additional advertising options and recommendations on improving traffic and conversion."

46.     When Selling Partners link with Brand Registry, Amazon states they [t]ap directly into Amazon's largest aggregated data reports, available exclusively to brand owners: Amazon search terms, repeat purchase behavior, market basket analysis, item comparison, alternate purchase behavior, and demographics."

47.     Additionally, Amazon offers Selling Partners that brand their products a service which is called Amazon Attribution that "measure how your off-Amazon advertising impacts your brand's shopping activity and sales on Amazon."

**Amazon controls the products sold on its site and "Partner Sellers"**

48.     To use Amazon's services to list products, Sellers <u>must</u> assent to Amazon's standardized Services Business Solutions Agreement ("the Agreement"). This Agreement governs <u>Amazon's total control</u> over the sales on its platform and the products it sells.

---

[13] https://sell.amazon.com/blog/how-to-find-wholesalers

10

49.     Through this agreement, Amazon reserves the right to, at any time, cease providing any or all of the services it offers Sellers at its sole discretion and without notice, including suspending, prohibiting, or removing any listing.

50.     Amazon can require Sellers to stop or cancel orders of any product. If Amazon determines that a Seller's actions or performance may result in risks or hazards, it may in its sole discretion withhold any payments to the Seller.

51.     Amazon controls what products can be sold on its marketplace.  It bans certain products and requires that others obtain approval.

52.     To obtain approval Amazon proclaims that its "approval process may include document requests, performance checks, and other qualifications."[14]

53.     Amazon explains that most of these documents can be obtained by a supplier.[15]

54.     Importantly, by allowing manufacturers—often foreign manufacturers with little or no oversight—to provide all documentation of quality control, there is no need for  Selling Partners  to  directly  engage  in  the  quality  control  of  their products.

55.     Amazon controls how products are displayed on its website, stating "[w]hen multiple sellers offer the same product, Amazon combines data from those various offers on a single detail page.  Sellers who offer the product can contribute detail page information—or request detail page reviews if the information displayed is incorrect.[16]

56.     Amazon controls the price Partner Sellers can list items on its store for. Through its "Fair Pricing Policy," Amazon monitors the prices Partner Sellers charge and may take action such

---

[14] https://sellercentral.amazon.com/help/hub/reference/external/200333160
[15] https://sellercentral.amazon.com/help/hub/reference/GKKYJ3C25DG334PW
[16] https://sell.amazon.com/sell

as terminating selling privileges of Partner Sellers that are charging a lower rate on other websites, including their own website.[17]

57.    Amazon offer's Fulfilled by Amazon (FBA) where Amazon, for a fee, handles the following:

Storing FBA products at its Amazon fulfillment centers.

Stocking and maintaining an inventory of Seller's products.

The use of Amazon employees to interact with the product to categorize, label, and move it through the distribution process.

Amazon delivery drivers to deliver a Seller's product directly to a customer's door in an Amazon vehicle.

58.    To manage customer concerns and complaints Amazon offers Amazon sponsored 24/7 customer service through Amazon's Seller Messaging Assistant.



59.    Amazon advises Partner Sellers to have manufacturers produce branded products in bulk, then use FBA for distribution. Amazon is in charge of accepting payment and issuing

---

[17] https://fingfx.thomsonreuters.com/gfx/legaldocs/xmvjkbqxjpr/2022-04-11%20Frame-Wilson%20Second%20Amended.pdf ;
https://fingfx.thomsonreuters.com/gfx/legaldocs/zjvqjndgnpx/Frame-Wilson-opinion-202

**Create your own branded products**

At some point in the life of your business, you may require specialty products featuring your own branding.
Selling branded products can help your business grow by helping you:

- Differentiate your business from other ecommerce brands
- Earn customer loyalty by building a unique online experience
- Building a memorable ecommerce brand identity
- Building brand recognition to help you launch future products

12

refunds on the products sold in its Amazon Store. This is done through a "secure transaction" where your credit card information won't be turned over to the Partner Seller.

60.    Amazon advises Partner Sellers to have manufacturers produce branded products in bulk, then use FBA for distribution. Amazon is in charge of accepting payment and issuing refunds on the products sold in its Amazon Store. This is done through a "secure transaction" where your credit card information won't be turned over to the Partner Seller.

61.    In the event of a product recall, Amazon will send out a notice to the purchaser of a product, as Amazon is the only entity with knowledge of who bought and sold a product.

62.    Amazon requires Partner Sellers to maintain $1,000,000 in commercial liability insurance when their sales exceed $10,000 in a month or at Amazon's request and to name Amazon and its affiliates, subsidiaries and assignees as additional insureds.[18]

63.    This level of control over products and Partner Sellers disproves Amazon's specious assertion that it is not a product seller, retailer and distributor, where Amazon in fact has far greater control than any ordinary brick and mortar retailer.

64.    This level of control over products and Partner Sellers, prominently displayed by Amazon to customers, also gives the public the impression that products sold on Amazon are safe.

**<u>Amazon misleadingly advertises its alleged product safety practices to drive sales—</u>**

**<u>not safety</u>**

65.    "Customers trust that they can always buy with confidence on Amazon."[19]

66.    Amazon gives the appearance of product safety, claiming it is "constantly innovating on behalf of our customers and working with regulators, third party experts, vendors, and sellers to improve the ways we detect and prevent illegal and unsafe products from reaching

---

[18] https://sellercentral.amazon.com/help/hub/reference/external/G200386300
[19] https://sellercentral.amazon.com/help/hub/reference/external/200164330

our marketplace. Amazon encourages you to report listings that violate Amazon's policies or applicable law by contacting us. We will investigate each report thoroughly and take appropriate action."

67.    Amazon claims that "our product safety team investigates and acts on reported safety complaints and incidents to protect customers from risks of injury related to products sold on Amazon.com."[20]

68.    Amazon claims it does "monitor the products sold on our website for product safety concerns," and "In concerning situations it may do the following:

Remove the products from the website.

Contact sellers and manufacturers for more information.

Put warnings on the product detail page.

Take other actions depending on the situation.

Report product safety concerns to relevant government agencies. This will strengthen their safety data and help with any necessary recalls."[21]

69.    Amazon knows that "compliance is critical to promoting safety for Amazon customers, employees, and partners, and ensuring that the products sold on Amazon meet regulatory requirements. It's important that products sold on Amazon's store are safe for customers to use, and that everyone who shops and sells in Amazon's store must be able to trust that the products are held to the highest standards."[22]

---

[20] https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X

[21] https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X

[22] https://sell.amazon.com/blog/manage-your-compliance

**Amazon misleadingly endorses products to drive sales—not safety**

70.    Although Amazon professes to value safety, the products recommended by and endorsed by Amazon have more to do with how much a Selling Partner spends with Amazon, or how likely a customer is to purchase a product, and not how safe a product is.

71.    In order to have a product show highly on search results, third-party Sellers can pay additional money to be a "sponsored products," "sponsored brands," "sponsored display."



72.    Between the data analytics collected about users and its state-of-the-art ways to market them, Amazon's own design influences and predicts how people will shop and what they will buy.  To increase sales Amazon affirmatively recommends products to buy Amazon identifies products beyond just sponsored or recommended. They include

> "Best seller," designee(s) which are given to the product with the most sales for a key word.

> "Amazon's Choice," designee(s) which are given to the product based on a combination of factors that include, sales, keyword ranking, availability, pricing, product reviews, and other factors.

"Highly Rated," designee(s) which are based on customer ratings.

73.    A study by fraudulent-review-detection service Fakespot found that around 42 percent of the 720 million Amazon reviews assessed in 2020 were fraudulent.[23]

74.    Despite the prevalence of fraudulent reviews, Amazon continues to base these designations and recommend products to customers in part based on fraudulent (fake) customer reviews.

**Amazon primes the distribution of dangerous products with no accountability**

75.    Amazon creates businesses that otherwise would not exist and opens channels for mass distribution of questionable products – that appear safe.

76.    Amazon warrants the safety of products, portends to regulate and oversee its products, but fails to.

77.    For example, in response to consumer concerns regarding the safety of products sold, on August 23, 2019, Amazon posted an article entitled, "Product safety and compliance in our store."[24]

78.    Amazon proclaims, "Safety is a top priority at Amazon. Products in our store must comply with relevant laws and regulations and our sophisticated tools prevent non-compliant products from being listed." The retailer boasts an "industry-leading safety and compliance program."

79.    Amazon claims, "In 2018 alone, we invested over $400 million to protect our store and our customers and built robust programs to ensure products offered are safe, compliant, and authentic."

---

[23] https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-cals-on-amazon-to-curb-rampant-fraudulent-reviews
[24] https://www.aboutamazon.com/news/company-news/product-safety-and-compliance-in-our-store

16

80.     Further, "Amazon offers customers hundreds of millions of items, and we have developed, and continuously refine and improve, our tools that prevent suspicious, unsafe, or non-compliant products from being listed in our store."

81.     Amazon cites, "For example, we require toys to be tested to relevant safety standards set by the Consumer Product Safety Commission. We have a dedicated global team of compliance specialists that review submitted safety documentation, and we have additional qualification requirements that sellers must meet to offer products."

82.     "Once a product is available in our store, we continuously scan our product listings and updates to find products that might present a concern. Every few minutes, our tools review the hundreds of millions of products, scan the more than five billion attempted daily changes to product detail pages, and analyze the tens of millions of customer reviews that are submitted weekly for signs of concern and investigate accordingly. Our tools use natural language processing and machine learning, which means new information is fed into our tools daily so they can learn and constantly get better at proactively blocking suspicious products."

83.     "We also regularly work with agencies including the Food and Drug Administration and Consumer Product Safety Commission, and the information we share helps them identify trends and develop regulations."

84.     Amazon tells customers it "monitor[s] the products sold on [its] website for product safety concerns."[25]

85.     Amazon advertises these safety assurances to "earn and maintain your trust," in order to attain and retain a larger and more active customer base.

---

[25] https://www.amazon.com/gp/help/customer/display.html?ref_=help_search_1-8&nodeId=GLD7VXFKV4AWU78X&qid=1685985303648&sr=1-8

86.     From the very beginning with the Bezos Flywheel, much of Amazon's business depends on the creation and success of an ever-growing population of otherwise unknown brands and partner sellers, using Amazon's credibility and mass distribution channels to drive revenue.

87.     In other words, Amazon makes businesses that would not otherwise exist to support its business.

88.     In doing so, Amazon injects into society the mass distribution of products, which can injure thousands of people, including defective products such as the negligently designed and manufactured heated gloves that caused this Plaintiff's injuries.

89.     Thus, Amazon creates an unreasonable risk of harm to the American public. When Amazon fails to live up to its safety and reliability promises and the reasonable expectations of consumers, it fails to take reasonable steps to prevent foreseeable harm.

90.     Even more, Amazon affirmatively selects products to highlight to customers, using labels like "Amazon's Choice" and "Highly Rated," based on sales and profits, and not the safety or reliability of the products for consumers.

91.     Then, when someone is injured or killed by a dangerous product sold on its platform, Amazon claims to not be a product seller at all and directs victims to small business Partner Sellers and often-foreign manufacturers.[26]

### He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si d/b/a Weide Heat

92.     He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si d/b/a Weide Heat is a Chinese company that manufactured the heated gloves that injured the plaintiff.

---

[26] https://www.cpsc.gov/s3fs-public/pdfs/recall/lawsuits/abc/002-In-the-Matter-of-Amazon-com-Inc-Answer-8-3-1.pdf

(Intentionally Left Blank)



93.    Weide Heat sold its heated gloves under the name "LPCRILLY Rechargeable Heated Glove" on Amazon.

94.    Weide Heat does not have a physical office or place of operations in the United States.

95.    LPCRILLY does not have a physical office or place of operations in the United States.

96.    Weide Heat is a merchant that sells products on Amazon through, upon information and belief, the FBA program and and/or supply chain by Amazon.

97.    LPCRILLY promotes itself as a "Professinal (sic) Heated Apparel Supplier" on Amazon (spelling error on the Amazon website).



98.    Weide Heat relies on Amazon to list, warehouse, store, sell, distribute and/or ship and deliver its products to consumers in the United States.

99.    Per Amazon's requirements, Weide Heat maintained a policy of insurance number 20250030782 issued by PICC Property and Casualty Co., Ltd. Shanghai Branch with $1,000,000.00 of coverage as required by Amazon and which has the following endorsement: "Amazon.com Services LLC., and its affiliates, subsidiaries and assignees are additional insureds, as their interests may appear. This insurance is primary and the insurer will not seek contribution from any other insurance available to Amazon under this insurance. Territory/ Jurisdiction: Worldwide including USA/Canada Insured Products: heated gloves." (PICC Policy DEC Sheet on page 21).

20

 **PICC**

## CERTIFICATE OF LIABILITY INSURANCE  NO.: 20250030782    DATE: 11/17/25

| PRODUCER<br><br>PICC Property and Casualty Company Limited Shanghai Branch<br>中国人民财产保险股份有限公司上海市分公司 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. INSURERS AFFORDING COVERAGE |
|---|---|
| INSURED<br>HeYuanShiWeiDeDianziKeJiYouXianGongSi<br><br>at the following address:<br><br>HeYuanShiYuanChengQuShangChengXiangQianJie27HaoYiCheng | INSURER:<br><br>PICC Property and Casualty Co., Ltd. Shanghai Branch |

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | PZAI20243100 QA00B27831 | 12/10/24 | 12/09/25 | EACH OCCURRENCE | USD1,000,000 |
| | | | | | GENERAL EACH OCCURRENCE | Not Covered |
| A | x  COMMERCIAL GENERAL LIABILITY | | | | FIRE DAMAGE (Any one fire) | Not Covered |
| | CLAIMS MADE | | | | MED EXP (Any one person) | Not Covered |
| | X  OCCURRENCE | | | | PERSONAL & ADV INJURY | Not Covered |
| | **GENERAL AGGREGATE LIMIT APPLIES PER:** | | | | PRODUCTS – COMP/OP AGG | USD1,000,000 |
| | x  POLICY | | | | GENERAL AGGREGATE | Not Covered |
| | PROJECT LOCATION | | | | | |
| | **AUTOMOBILE LIABILITY** | | | | COMBINED SINGLE LIMIT | Not Covered |
| | ANY AUTO | | | | BODILY INJURY (Per person) | Not Covered |
| | ALL OWNED AUTOS | | | | BODILY INJURY (Per accident) | Not Covered |
| | SCHEDULED AUTOS HIRED AUTOS | | | | PROPERTY DAMAGE (Per accident) | Not Covered |
| | NON-OWNED AUTOS | | | | | |
| | **WORKERS COMPENSATION AND** | | | | WC STATUTORY LIMITS/ OTHER | Not Covered |
| | **EMPLOYER'S LIABILITY** | | | | EL. EACH ACCIDENT | Not Covered |
| | | | | | EL. DISEASE-EACH EMPLOYEE | Not Covered |
| | | | | | EL. DISEASE-POLICY LIMIT | Not Covered |
| | **OTHER** | | | | | |
| | THIRD PARTY PRODUCT RECALL EXPENSE COVERAGE | | | | PRODUCT RECALL EXPENSE AGGREGATE LIMIT | Not Covered |
| | **ERRORS OR OMISSIONS LIABILITY** | | | | EACH WRONGFUL ACT | Not Covered |
| | CLAIMS MADE OCCURRENCE | | | | GENERAL AGGREGATE | Not Covered |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS
**Policy subject to Vendor's Endorsement.**
**Amazon.com Services LLC., and its affiliates, subsidiaries and assignees are additional insureds, as their interests may appear.**
**This insurance is primary and the insurer will not seek contribution from any other insurance available to Amazon under this insurance.**
**Territory/ Jurisdiction:  Worldwide including USA/Canada**
**Insured Products:**
heatedgloves:加热手套

**Deductible:**
N/A

100.    Upon information and belief, exercising its inventory control, Amazon intentionally took possession of a large quantity of these gloves, maintained them in Amazon warehouses, stored, handled, packaged, distributed and shipped the subject product directly to consumers and end users, including the Plaintiff, through its fulfillment system.  Amazon had the ability to prevent the product from reaching consumers, and derived direct financial benefit from the sale. Consumers such as this Plaintiff reasonably relied on Amazon's platform, representations, and reputation in purchasing and using the product.

101.    Upon information and belief, Weide Heat used Fulfillment by Amazon, where "Amazon fulfillment specialists can pick, pack, and ship the order. [Amazon] can also provide customer service and process returns for those orders."[27]

102.    Upon information and belief, Amazon, as retailer, warehouser, packager and distributor of the Weide Heat heated gloves, received Plaintiff's father's order, selected the product to send, packaged the Weide Heat heated gloves, shipped the Weide Heat heated gloves and delivered the Weide Heat heated gloves.

103.    Notably, New York law imposes liability on all entities that participate in placing a defective product into the stream of commerce regardless of whether they take title to the product.

**Defendants' Failure to Act on Multiple Consumer Safety Complaints**

104.    The LPCRILLY heated gloves are advertised as having heat settings that range from low to medium to high and the desired heat settings can be selected by simply pushing a button on the glove that displays a corresponding color to match the heat setting. Amazon advertised the gloves with a photo of the product as being "…echargeable Electric Heated

---

[27] https://sell.amazon.com/fulfillment-by-amazon

Gloves for Men and Women, Heated Gloves for Arthritis Hands, Ultrathin Hand Warmer Screen Touchable...”



LPCRILLY echargeable Electric Heated Gloves for Men and Women, Heated Gloves for Arthritis Hands,Ultrathin Hand Warmer Screen Touchable,Winter Flexible Washable Heating
In Stock
FREE delivery **Sat, Sep 20** available at checkout
FREE Returns
☐ This is a gift Learn more
**Size: Medium**

105.    In the high heat mode, the heated gloves glow red, and temperatures can reach 122°F or 50°C.

106.    In the medium heat mode, the Heated gloves glow green, and temperatures can reach 113°F or 45°C.

107.    In the low heat mode, the Heated gloves glow blue, and temperatures can reach 95°F or 35°C.

108.    Despite numerous consumer complaints and warnings about quality control generally on Amazon's retail website, risk of burn injuries specifically and the failure of the gloves to regulate heat, neither Amazon nor Weide Heat pulled the product from the market or did anything to warn product users, include the Plaintiff Simone Vilaire, that the product was or may be unsafe due to its design or manufacture.

109.    Over a period of several years, there have been other documented reports of the Weide Heat heated gloves failing to regulate and burning the users that were reported to Amazon as it instructed users to report reviews on Amazon's Website.[28]

---

[28] These reviews have been removed by Amazon

110.    Examples of the reviews of the gloves that have since been removed by Amazon from its website include:

On March 7, 2022, a user wrote: "I had a severe experience that could have been serious had I not been able to remove them. As soon as I turned them   they became intensely hot to the point that they blistered my hands…"

On May 13, 2022, a user wrote that one of the pair "turns on automatically and you can't change the heat level or turn it off unless you pull the plug."

On May 18, 2025, a user wrote "These gloves are not as advertised as they do not heat up evenly and actually almost burn your middle digits as the heat is too hot in the middle digit."

On August 25, 2025, a user wrote "The heating wires run along the edges of the fingers and don't even disperse the heat around the finger... just hot right next to the wire... And the hot wires burn your fingers where they press into your skin while your hands is wrapped around the handlebars [of a bicycle]."

111.    Upon information and belief, these complaints were available to and reviewed by Defendants through Amazon's product monitoring systems, customer review tracking, and internal safety reporting mechanisms described herein.

112.    Importantly, on its website, Amazon's posted response to these notices of the gloves dangerous defect was: "This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience."

113.    No warnings of the failure of the heated gloves to regulate the temperature properly and safely and/or shut off when the heated glove reached extreme heat levels were written on the box that the heated gloves were packaged in or provided in pamphlets or other papers inside the box.  As seen in the manual supplied with the subject gloves, no warnings at all are given to end users (Image of user manual on page 25).



114.    No warnings with regard to the use of the defective, dangerous gloves were published on the page for the Weide Heat heated gloves on Amazon's website.

115.    Defendants' failure continued from at least 2022 until the Plaintiff's injuries sustained on August 11, 2025.

**The Plaintiff's Injuries**

116.    On May 9, 2025 Plaintiffs father placed an order on Amazon.com, order #112-2480275-0361065, for a pair of LPCRILLY Rechargeable Heated Gloves For Men And Women as a gift for his daughter, plaintiff Simone Vilaire. Dr. Vilaire was a practicing Doctor of Chiropractic (DC) in New York and a breast cancer survivor. As a result of her past treatment for

25

breast cancer, Simone suffers from an insensate left arm and hand. Simone complained of cold and joint pain in her hands to her father, who purchased the gloves as a gift for his daughter.

117.    The heated gloves were thereafter shipped and delivered to Plaintiff's father.

118.    The Plaintiff's father did not unbox the heated gloves before gifting them to his daughter.

119.    The packaging that the heated gloves were delivered in was a cardboard box with Amazon's logos on it.

120.    The heated gloves were packaged in a separate box with Weide Heat's LPCRILLY trademark logo on it.

121.    The box the heated gloves were packaged in stated that they were manufactured by He Yuan Shi Wei De Dianzi Ke Ji You Xian Gong Si with an address in China.

122.    The Weide Heat box had no writings or indications that the gloves failed to regulate the temperature inside the gloves or that they failed to shut off when the temperature inside the glove reached a dangerously high temperature.

123.    The packaging and instructions for use that came inside the box had no indication or warning that the gloves failed to regulate the temperature inside the gloves or that they failed to shut off when the temperature inside the glove reached a dangerous high temperature.

124.    The Plaintiff first used the heated gloves on August 11, 2025.

125.    The heated gloves had settings for Low, Medium and High.

126.    The Plaintiff set the heated gloves to the lowest setting on August 11, 2025 at approximately 10:00 P.M. She thereafter dozed off for about two hours and when she awoke, the heated glove on her left hand was at an extremely hot temperature.

127.    Plaintiff had made no alteration or changes to the heating mechanism or

26

temperature setting or the battery in the heated gloves.

128.    Plaintiff was using the heated gloves as intended and foreseeable for the purpose of keeping her hands warm.

129.    Plaintiff's left hand was severely burned, and she was in extreme pain.



130.    Plaintiff sought medical treatment the following morning at Memorial Sloan Kettering Medical Center and was transferred and admitted to the Cornell Hospital Burn Unit on August 18, 2025 for burn and wound care.

131.    Plaintiff was discharged on August 22, 2025 on a regimen of home wound care.

132.    Despite diligent wound care, Plaintiff's burns and injuries did not heal, became necrotic and on October 8, 2025 she was caused to undergo the amputation of the thumb, index finger and finger on her left hand.



133.    Plaintiff is a chiropractor by profession. Because of her injuries she has been unable to work in her chosen profession and will never be able to resume her work as a chiropractor.

134.    Plaintiff has also been unable to perform many household chores since August 1, 2025 and has had to rely on family friends and other support individuals to assist with many activities of daily living.

135.    Plaintiff suffered and continues to suffer significant permanent scarring and disfigurement and limitations of use of her left dominant hand and fingers as a result of her injuries.

**LIABILITY**

**AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT AMAZON**

**Strict Products liability- Design Defect**

136.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" through "135" as though fully stated herein

137.    Amazon was the seller, retailer and distributor of the Weide Heat heated gloves in that Amazon stored, selected, packaged, shipped, and delivered the Weide Heat heated gloves to Plaintiff's father.

138.    The Weide Heat heated gloves were defective when they left the control of Amazon in that they were negligently designed in that they lacked adequate temperature regulation, sensor feed/b/a ck, and automatic shutoff mechanisms despite being designed to generate heat in direct contact with the user's skin.

139.    The Weide Heat heated gloves were unreasonably dangerous for their intended and foreseeable use in that they could reach excessively high temperatures during normal use without adequate controls to prevent thermal injury.

140.    Plaintiff was using the Weide Heat heated gloves as intended and in a reasonably foreseeable manner.

141.    The Weide Heat heated gloves, as designed, posed a substantial likelihood of harm in that activation of the heat settings could cause the gloves to reach excessively high temperatures during ordinary use, thereby exposing users to burn injuries.

142.    It was feasible to design the gloves more safely by incorporating temperature sensors, feedback controls, and automatic shutoff mechanisms to limit heat exposure.

143.    The design defects were a substantial factor and proximate cause of Plaintiff's

injuries and damages.

144.    As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT AMAZON**

**Strict Products Liability – Manufacturing Defect**

145.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" through "144" as though fully stated herein.

146.    Amazon was the warehouse, storage facility, packager, retailer and distributor of the Weide Heat heated gloves in that Amazon stored, selected, packaged, shipped, and delivered the Weide Heat heated gloves to Plaintiff's father.

147.    The Weide Heat heated gloves were defective due to errors in the manufacturing process, improper workmanship, and/or the use of defective materials, resulting in failure to regulate heat output during normal operation.

148.    The Weide Heat heated gloves were defective when they left the control of Amazon.

149.    Due to the defective manufacturing, the Weide Heat heated gloves deviated from the expected performance of heated gloves of like kind and quality in that it is not expected that heated gloves of light kind and quality would reach extreme heat temperatures causing burns to a

30

user's hands in the ordinary course of their use as heated gloves.

150. Plaintiff did not contribute to the cause of the extreme heat of the heated gloves.

151. The manufacturing defects were a substantial and proximate cause of Plaintiff's injuries as alleged.

152. As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT AMAZON**

**<u>Strict Products Liability- Failure to Warn</u>**

153. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" through "152" as though fully stated herein.

154. Amazon was the retailer and distributor of the Weide Heat heated gloves in that Amazon stored, selected, packaged, shipped, and delivered the Weide Heat heated gloves to Plaintiff's father.

155. The Weide Heat heated gloves were defective when they left the control of Amazon.

156. Amazon owed a duty, arising from its role as retailer, distributor, and entity exercising control over the product, to warn consumers of the risk that the gloves could reach dangerously high temperatures that can happen because the heated gloves failed to have sensor

31

feedback and effective control systems, including temperature sensing and time exposure limitations.

157.    Amazon knew or should have known, including based on prior consumer complaints described herein on its retail website, of latent defects resulting from the intended use of the of the Weide Heat heated gloves, namely that heated gloves that did not possess sensor feedback and effective control systems, including temperature sensing and time limited time exposure limitations could reach extreme heat temperatures.

158.    Amazon failed to provide adequate warnings or instructions concerning the risk of excessive heat, burn injury, and failure of temperature regulation inherent in the heated gloves or to remove the product from being sold on its website. They failed to give users adequate directions regarding indoor or outdoor use.

159.    Amazon's failure to provide warnings or to remove the dangerous product from being sold on its website was a substantial factor and proximate cause of Plaintiff's harm.

160.    As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR AN FOURTH CAUSE OF ACTION AGAINST DEFENDANT AMAZON**

**<u>Negligence</u>**

161.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" through "160" as though fully stated herein.

162.    Amazon was the seller, retailer and distributor of the Weide Heat heated gloves in that Amazon intentionally stored, selected, packaged, shipped, and delivered the Weide Heat heated gloves to Plaintiff's father.

163.    Amazon owed a duty, arising from its role in designing, marketing, distributing, and selling the product, to exercise reasonable care in properly designing, manufacturing, testing, marketing, advertising, labeling, packaging, selling, and providing adequate warnings for the Weide Heat heated gloves.

164.    Amazon breached its duty by failing to implement reasonable safety controls, testing, and warnings, thereby allowing a product capable of causing burn injuries to be sold to consumers so that the Weide Heat heated gloves were rendered defective and reasonably certain to be dangerous.

165.    Amazon's negligent designing, manufacturing, testing, marketing, advertising, labeling, packaging, selling, and failing to provide warnings for the Weide Heat heated gloves was a substantial and proximate cause of Plaintiff's injuries.

166.    As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers,

33

significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST HE YUAN SHI WEI DE DIANZI KE JI YOU XIAN GONG SI d/b/a  WEIDE HEAT**

**<u>Strict Products Liability – Design Defect</u>**

167.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" to "166" as though fully stated herein.

168.   Weide Heat manufactured and designed the LPCRILLY Weide Heat heated gloves.

169.   The Weide Heat heated gloves were defective when they left the control of Amazon in that they lacked adequate temperature regulation, sensor feed/b/a ck, and automatic shutoff mechanisms despite being designed to generate heat in direct contact with the user's skin.

170.   The Weide Heat heated gloves were unreasonably dangerous for their intended use in that they could reach excessively high temperatures during normal use without adequate controls to prevent thermal injury.

171.   Plaintiff was using the Weide Heat heated gloves as intended and in a reasonably foreseeable manner.

172.   The Weide Heat heated gloves, as designed, posed a substantial likelihood of harm in that activation of the heat settings could cause the gloves to reach excessively high temperatures during ordinary use, thereby exposing users to burn injuries.

173.   It was feasible to design the gloves more safely by incorporating temperature sensors, feedback controls, and automatic shutoff mechanisms to limit heat exposure.

174.   The design defects were a substantial and proximate cause of Plaintiff's injuries and damages.

34

175.    As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT**
**HE YUAN SHI WEI DE DIANZI KE JI YOU XIAN GONG SI d/b/a  WEIDE HEAT**

**Strict Products Liability – Manufacturing Defect**

176.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1"  through "175" as though fully stated herein.

177.    The Weide Heat heated gloves were defective due to errors in the manufacturing process, improper workmanship, and/or the use of defective materials, resulting in failure to regulate heat output during normal operation.

178.    The Weide Heat heated gloves were defective when they left the control of Weide Heat.

179.    Due to Weide Heat's defective manufacturing, the Weide Heat heated gloves deviated from the expected performance of comparable heated gloves in that it generated excessive and uncontrolled heat during ordinary use, causing burn injuries causing burns to a user's hands in the ordinary course of their use as heated gloves.

180.    Plaintiff did not contribute to the cause of the extreme heat of the heated gloves.

181.    The manufacturing defects were a substantial and proximate cause of Plaintiff's injuries as alleged.

35

182.    As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANT HE YUAN SHI WEI DE DIANZI KE JI YOU XIAN GONG SI d/b/a WEIDE HEAT**

**Strict Products Liability- Failure to Warn**

183.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" through "182" as though fully stated herein.

184.    The Weide Heat heated gloves were defective when they left the control of Weide Heat.

185.    Weide Heat owed a duty, arising from its role as retailer, distributor, and entity exercising control over the product, to warn consumers of the risk that the gloves could reach dangerously hot temperatures because the heated gloves failed to have sensor feedback and effective control systems, including temperature sensing and time exposure limitations.

186.    Weide Heat knew or should have known, including based on prior consumer complaints described herein and the nature of the product's heat-generating components, of latent defects resulting from the intended use of the of the Weide Heat heated gloves, namely that heated gloves that did not possess sensor feedback and effective control systems, including temperature sensing and time limited time exposure limitations, could reach extreme heat

36

temperatures.

187.    Weide Heat failed to provide adequate warnings or instructions concerning the risk of excessive heat, burn injury, and failure of temperature regulation inherent in the heated gloves.

188.    Weide Heat's failure to provide warnings was a substantial factor and proximate cause of Plaintiff's harm.

189.    As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

**AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANT HE YUAN SHI WEI DE DIANZI KE JI YOU XIAN GONG SI d/b/a WEIDE HEAT**

**<u>Negligence</u>**

190.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs "1" through "189" as though fully stated herein.

191.    Weide Heat owed a duty, arising from its role in designing, marketing, distributing, and selling the product, to exercise reasonable care in properly designing, manufacturing, testing, marketing, advertising, labeling, packaging, selling, and providing adequate warnings for the Weide Heat heated gloves.

192.    Weide Heat breached its duty by failing to implement reasonable safety controls,

testing, and warnings, thereby allowing a product capable of causing burn injuries to be sold to consumers so that the Weide Heat heated gloves were rendered defective and reasonably certain to be dangerous.

193. Weide Heat's negligent designing, manufacturing, testing, marketing, advertising, labeling, packaging, selling, and failing to provide warnings for the Weide Heat heated gloves was a substantial factor and proximate cause of Plaintiff's injuries.

194. As a direct and proximate result of the foregoing and through no fault of her own, plaintiff suffered severe burns to her left hand and fingers that became necrotic requiring amputation of her left thumb through the interphalangeal joint, amputation of her left index finger through the proximal phalanx, and amputation of her left middle finger through the proximal phalanx, significant and permanent disfiguration of her left hand and fingers, significantly impaired mobility, pain and suffering, past and future medical expenses, lost past and future wages and emotional distress.

## JURY DEMAND

195. Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

***WHEREFORE***, plaintiff Simone Vilaire demands judgment in her favor against all Defendants on each of the above causes of action and for the following:

1. Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain and suffering, emotional distress, significant and permanent scarring and disfigurement, impaired mobility, medical expenses, out of pocket expenses, and lost wages, in an amount to be determined at trial of this action;

2. Punitive damages for the wanton, willful, fraudulent, misleading and reckless acts of the Defendant which constitute gross negligence as Defendants demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to plaintiff, and an amount to be determined at trial of this action;

3. Pre- and post- judgment interest;

4. Costs and expenses;

5.Such other and further relief as this court deems just comma proper comma and equitable.

Dated: New York, New York
      May 6, 2026

                          Yours, etc.

                          BEATTY LAW, PLLC

                          *John P. Beatty*

                          John P. Beatty, Esq.
                          *Attorney for Plaintiff*
                          SIMONE VILAIRE
                          99 Wall Street, Suite 1750
                          New York, NY 10005
                          Phone: (212) 540-4111